IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LAURA A. MARTINEZ-THRASH, | § | |
| Individually and as a person interested in | § | |
| Charles Inness Thrash; and | § | |
| BRITTANY A. MARTINEZ-THRASH, | § | |
| Individually and as a person interested in | § | |
| Charles Inness Thrash, | § | |
|     Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. |
| | § | 5:19-CV-00467 |
| TONYA M. BARINA, INDIVIDUALLY | § | |
| and as GUARDIAN OF THE ESTATE of | § | |
| Charles Inness Thrash, an adult; and | § | |
| MARY C. WERNER, INDIVIDUALLY | § | |
| and as GUARDIAN OF THE PERSON | § | |
| of Charles Inness Thrash, an adult | § | |
|     Defendants. | § | |

## VERIFIED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, LAURA A. MARTINEZ-THRASH, Individually and as a person interested in Charles Inness Thrash, an adult; and BRITTANY A. MARTINEZ-THRASH, Individually and as a person interested in Charles Inness Thrash, an adult, Plaintiffs, by and through undersigned counsel, and file this Verified Original Complaint complaining of TONYA M. BARINA, Individually and as GUARDIAN OF THE ESTATE of Charles Inness Thrash, an adult; and MARY C. WERNER, Individually and as GUARDIAN OF THE PERSON of

Charles Inness Thrash, an adult, Defendants, and in support thereof would show the Court as follows:

## I.  PARTIES

1.1 Laura A. Martinez-Thrash (Laura), individually and as a person interested in Charles I. Thrash.

1.2 Brittany A. Martinez-Thrash (Brittany), individually and as a person interested in Charles I. Thrash.

1.3 Tonya M. Barina (Tonya), individually and as guardian of the estate of Charles Inness Thrash, an adult. Tonya may be served with citation at her residence at 4610 Old Seguin Luling Road, Seguin, Guadalupe County, Texas 78155.

1.4 Mary C. Werner (Mary), individually and as guardian of the person of Charles Thrash, an adult. Mary may be served with citation at her residence at 310 Fawn Drive, San Antonio, Bexar County, Texas 78231.

## II. JURISDICTION AND VENUE

2.1     Jurisdiction of this Court is invoked under 28 U.S.C., Sections 1331 in order to secure relief authorized by 42 U.S.C., §§ 1983 and 1988 pursuant to the First and Fourteenth Amendments to the Constitution of the United States.

2.2     Laura and Brittany submit that they have fulfilled all notice requirements for filing suit.

2.3     Laura and Brittany submit that venue for this case is proper in the Western

District of Texas, San Antonio Division.

## III.  FACTUAL AND PROCEDURAL BACKGROUND

3.1    On June 24, 2016, Charles Inness Thrash (Charlie) executed a valid durable power of attorney, a valid medical power of attorney and a valid will. Charlie appointed Laura as his agent in the event of future incapacity. (True and correct copies of Charlie's powers of attorney are attached hereto as Exhibit "A" and incorporated herein for all purposes).

3.2    Charlie and Laura lived and worked together as life partners, common law spouses, and/or business partners from August 2012 until March 2019. At first, they resided in the apartment at Charlie's automotive garage at 4838 West Avenue, San Antonio, Texas. They also had residences at 28120 Boerne Stage Road, Hanger No. 308, Boerne, Texas, in Charlie's aircraft hangar, as well as Charlie's condominium at 4107 Medical Drive, San Antonio, Texas. A few of years ago, Charlie and Laura bought their retirement home at 310 Harvard Oak, San Antonio, Texas, where Charlie and Laura lived with Laura's two adult children Jose and Michelle Martinez as an informal family.

3.3    Charlie, Laura and Brittany were business partners. Brittany had a lease for Charlie's auto repair shop at 4838 West Avenue, San Antonio, Texas, where Charlie, Laura and Brittany worked and managed CT Thrash Differential and Axle Service as a partnership until January 2019. Laura and Charlie were Landlords on

a lease with Michael A. Siller as tenant at 1350 Eckhert Rd., San Antonio, Texas, dated February 2, 2017. The lease provided for renegotiation on February 2, 2020. Charlie and Brittany co-managed CT Thrash Differential and Axle Service, where she leased the business and they worked together in their common enterprise with Laura. (A true and correct copy of the February 2, 2017 Commercial Gross Lease is attached hereto as Exhibit "B" and incorporated herein for all purposes).

3.4     Brittany's commercial lease also included an apartment, where she lived in Charlie's airplane hangar at the Boerne Airport. Charlie and Brittany shared the use of the hangar, where he stored his airplanes, tools and equipment.

3.5     On August 23, 2017, an application was filed to appoint a guardian of Charlie's person and estate, which was based on an unfounded and/or false abuse and exploitation complaint to Texas Health and Human Services Commission. Tonya M. Barina (Tonya), who claimed to be a distant relative of Charlie, also applied to be appointed guardian of Charlie's person and estate.

3.6     On August 28, 2017, the Judge of Probate Court No. 2, Bexar County, Texas appointed attorney Tom Bassler as temporary guardian of Charlie's person and estate.

3.7     On or about October 8, 2017, Charlie was examined by Dr. Raymond Faber, M.D., a court-appointed psychiatrist, who reported that Charlie had moderate dementia and Alzheimer's disease with a poor prognosis. Dr. Faber reported that

Charlie was totally incapacitated, and the Court determined that Charlie needed a temporary guardianship of his person and estate.

3.7    However, Brittany and Laura allege and would prove that Charlie does not presently lack mental or physical capacity, and he was probably mis-diagnosed in 2017 because he recovered, went back to work, and was engaged in his livelihood at CT Thrash Differential and Axle Service from June 15, 2018 until January 10, 2019, when Tonya changed the locks and locked Charlie, Brittany and Laura out of Charlie's property at 4838 West Avenue, San Antonio, Texas.

3.8    On May 22, 2018, the probate court began a trial on the merits of the applications to appoint guardians of Charlie's person and estate. Attorney Robert Augsberger testified regarding his experience, qualifications and background; the facts and circumstances of Charlie's estate planning execution; and the validity of Charlie's powers of attorney.

3.9    The probate court questioned Laura why she and Charlie don't get married. Charlie stated on the record that they were going to get the judge to marry them. Then there was a discussion with the probate judge, which showed evidence that Charlie and Laura already met the requirements for a common law marriage, tending to encourage marriage, and stating that marriage would solve the guardianship issue. Nevertheless, the probate judge did not acknowledge the common law marriage.

3.10   Andrea Roelofs, an employee of Texas Health and Human Services Commission testified that there was a complaint of financial exploitation that was investigated by Adult Protective Services because it was suspected, but it was not validated by APS.

3.11   After nine months, on or about June 11, 2018, Mr. Bassler's letters of guardianship expired by operation of law, and on June 20, 2018, he requested termination of the temporary guardianship. Upon information and belief, Frost Bank closed the temporary guardianship account on June 11, 2018.

3.12   Then, it was necessary for Laura to assume her powers as Charlie's agent according to his 2016 statutory durable power of attorney and medical power of attorney and pursuant to the September 11, 2017 Amended Order of the probate court.

3.13   Laura opened an estate account and began serving as Charlie's agent on or about June 11, 2018. Laura served faithfully and efficiently as Charlie's agent under his powers of attorney until the Court revoked the powers of attorney and appointed Laura as permanent guardian of Charlie's person.

3.14   On July 12, 2018, the probate court considered motions and evidence on the application for guardianship. The probate court, without hearing any testimony from the witness, considered a report by Dr. Michael Garcia, dated June 15, 2017, which suggested that Charlie had degenerative dementia of the Alzheimer's type,

although re-evaluation may be considered in 12 months or less, and he required 24-hour supervision to safely negotiate his environment.

3.15   The probate court, without hearing any testimony from the witness, also considered a report by Dr. Raymond Faber, M.D., dated October 11, 2017, which stated Dr. Faber's opinion that Charlie was totally incapacitated.

3.16   Brittany and Laura allege and would prove that they helped Charlie maintain his lifestyle and daily activities during 2018, notwithstanding his court-ordered temporary guardianship. Although Charlie was not totally excluded from his work, recreational, social and personal activities, during the term of the temporary guardianship, the temporary guardianship did not provide Charlie a supportive environment for maintaining and restoring his capacity or engaging in his livelihood.

3.17   However, after Laura started acting as Charlie's agent under his powers of attorney, he started working at his automotive repair shop and became engaged in his livelihood again, which had a positive affect on his mental capacity and general health and well being. Evidence including 10 audio-video recordings of Charlie working in his automotive shop between October 2018 and January 2019, show that Charlie had the physical and mental capacity to work in his automotive repair shop at the time the probate court adjudicated his total incapacity and ordered a full guardianship. (Affidavits and attached thumb drive containing

authenticated A-V recordings of Charlie working in his shop from October 2018 through January 2019, are attached hereto as Exhibit "C" and incorporated herein for all purposes).

3.18   Attorney Ben Wallis, III, attorney ad litem, testified that he did not believe that Charlie was totally incapacitated and that he was very clear on what he wanted to do with his life and where he wanted to live.

3.19   Attorney Tom Bassler, temporary guardian, testified that he sat in on Dr. Faber's interview, and he was surprised to see the evaluation of total (incapacity). Mr. Bassler stated that he agreed with Mr. Wallis' assessment that Charlie's long term memory was phenomenal. Mr. Bassler stated his opinion that the wrong thing would be to put Charlie in a nursing home and take away his automobiles.

3.20   Mr. Bassler also testified that for the nine months that he was temporary guardian, Laura did an excellent job of managing Charlie's medical and health needs.

3.21   Although there were allegations of unsuitability of Laura as guardian, there was no evidence presented to show that she was in any way unsuitable or that the power of attorney was not an adequate, less restrictive alternative to guardianship. To the contrary, Mr. Wallis testified that the allegations brought by Frost Bank and the investigation by APS made no findings against Laura, and there were no probate court findings against Laura.

3.22   Tom Bassler testified regarding the facts and circumstances including a thorough review of Charlies finances related to his temporary guardianship during the preceding nine months. Mr. Bassler testified that he found no evidence that Laura had converted any of Charlie's assets or did anything wrong with his assets or money.

3.23   Mr. Bassler also testified that Laura took good care of Charlies personal and medical needs and that he was happy living with her and having her as his companion.

3.24   Mr. Bassler also testified about Charlie's estate planning and that he found that Charlie was consistent in his estate planning from 2004, when he executed a will drafted by Mr. Bassler, until 2016, when he executed a new will drafted by Mr. Augsburger. Charlie did not leave any inheritance to his step-children or other relatives. He left everything to his girlfriend and another friend or just to his girlfriend.

3.25   Mr. Bassler further testified about Charlie's financial transactions without changing his conclusions that there was no evidence of exploitation or malfeasance by Laura.

3.26   At the end of the hearing on July 12, 2018, the probate court took judicial notice of Charlie's preference regarding selection of guardians. The probate court

also concluded that Charlie was not giving his relatives any money, so they weren't getting cheated anyway.

3.27   Tonya testified that all of Charlie's property was in his name. Tonya also testified that she did not have any evidence to show that Charlie's 2016 powers of attorney were affected by undue influence by Laura. She also testified that she had no plans to change Charlie's life, separate him and Laura, or move him from his home.

3.28   On July 19, 2018, Ben Wallis, III, attorney ad litem, sent a letter to the probate court stating that Charlie and Laura refused to pay Tonya's legal fees as discussed with the judge in chambers. The implication was that the probate judge was concerned about all the lawyers getting paid even if there was no guardianship, and when Charlie and Laura refused to pay Tonya's legal fees even if the guardianship was not ordered, the probate court ordered an unwarranted guardianship as the only available mechanism to ensure that all the lawyers got paid. (A true and correct copy of the July 19, 2018 letter from Charlie's attorney ad litem to the Court is attached hereto as Exhibit "D" and incorporated herein for all purposes).

3.29   Laura and Brittany respectfully submit that there is evidence that the probate judge was motivated to order the guardianship, notwithstanding

uncontroverted evidence that there were less restrictive alternatives in place, so that all the lawyers could be paid.

3.30   The July 19, 2018 letter from Charlie's attorney ad litem shows that there was discussion with the Court in chambers regarding Judge Rickhoff's concern that the lawyers should get paid even if there was no guardianship, which was improper, such that the guardianship was tainted by the appearance of impropriety and/or official oppression. Thus, it appears that the probate court was motivated by its concern that it be authorized to pay all the lawyers, which Charlie and Laura refused to do voluntarily, when it ordered the guardianship.

3.31   On October 1, 2018, Charlie, Laura and Brittany executed the written lease for the repair shop and hangar, when Laura was acting as Charlie's agent under his durable power of attorney after the temporary guardianship expired and before November 15, 2018, when the permanent guardian was appointed. (A true and correct copy of the October 1, 2018 Commercial Gross Lease is attached hereto as Exhibit "E" and incorporated herein for all purposes).

3.32   By the time of the hearing on applications to appoint guardians, it had been more than a year since Charlie was diagnosed by Drs. Faber and Garcia, and Charlie was no longer incapacitated. So, it appears that Drs. Faber and Garcia misdiagnosed Charlie as totally incapacitated and suffering from degenerative Alzheimer's Disease with a poor prognosis, because uncontroverted evidence

shows that Charlie recovered his capacity after he was allowed to resume his livelihood.

3.33   On November 15, 2018, the probate court revoked the durable power of attorney as well as the medical power of attorney, which were in effect at the time, notwithstanding testimony by Mr. Bassler that there was no evidence of financial exploitation or misappropriation by Laura, and she had been doing an excellent job taking care of Charlie.

3.34   The probate court ruled without considering legally or factually sufficient evidence to support its findings "by clear and convincing evidence" that:

> * Alternatives to Guardianship and supports and
> services available to the Ward that would avoid the
> need for guardianship have been considered and
> determined not to be feasible;
>
> * The respective Guardians should be granted the full
> powers and authority over the Ward allowed under the
> Texas Estates Code;
>
> * The rights of the Ward should be fully limited, including
> the right to vote in a public election and the right to drive
> a motor vehicle;
>
> * The Ward is totally without capacity to care for himself,
> manage his property, operate a motor vehicle, vote in a
> public election, make personal decisions regarding residence,
> to contract, and to marry;
>
> * The Ward is an incapacitated person as defined by Section
> 1002.017 of the Texas Estates Code, who has no legal
> Guardian of his person and estate, such incapacity being
> evidenced by recurring acts or occurrences within the

preceding six-month period and not by isolated instances of negligence or bad judgment;

\* It is in the best interest of the Ward to have the Court appoint persons as his Guardian; and

\* The rights of the Ward and his property will be protected by the appointment of Guardians.

3.35 Laura and Brittany respectfully submit that there was no proof of incapacity being evidenced by recurring acts or occurrences within the preceding six-month period. To the contrary, uncontroverted evidence that Charlie was working in his automotive repair shop shows that he was not totally incapacitated.

3.36 On November 15, 2018, the probate court appointed Laura as guardian of Charlie's person and Tonya as guardian of Charlie's estate, notwithstanding the fact that Laura was acting as Charlie's agent pursuant to his durable power of attorney, which was a less restrictive alternative to guardianship.

3.37 Additionally and alternatively, Laura and Brittany allege and would prove that Charlie had supports and services, which were in effect and were a less restrictive alternative to guardianship.

3.38 On the same day she took her oath as guardian of the estate, Tonya closed Laura's estate account without notice without making prior arrangements for providing financial support, managing finances and otherwise taking care of Charlie's estate.

3.39  Laura and Brittany filed a motion to remove guardians and attached evidence to prove that Tonya was unsuitable to serve as guardian of Charlie's estate because she acted without regard to Charlie's preferences and rights to maintain and restore his capacity.

3.40  In particular, Tonya prevented Charlie from remaining actively engaged in his business and hobby pursuits to the extent of his ability in the context of his auto specialty repair shop known as CT Thrash Differential and Axle Service on West Avenue.

3.41  On or about January 10, 2019, Tonya changed the locks at Charlie, Laura and Brittany's auto repair shop at 4838 West Avenue without notice and posted a notice that the business was closed due to non-payment of rent.

3.42  Tonya violated Charlie, Laura and Brittany's rights to maintain possession of his shop and personal property and to engage in their livelihood without due consideration of Charlie's preferences and well-being or their partnership contract rights by locking them out in violation of the express terms of the November 15, 2018 Order appointing guardian, which mandated compliance with the Rights of Wards.

3.43  Charlie's auto repair shop was his livelihood, which he built up over 60 years, and his estate could afford to keep it open, whether as a profitable enterprise or as a hobby, which was Charlie's preference.

3.44   Tonya also breached the October 1, 2018 Commercial Gross Lease CT Thrash Differential and Axle Service on West Ave., San Antonio, Texas.

3.45   Laura and Brittany submit that uncontroverted evidence attached to their motion to remove the guardians showed that Tonya's violations of the terms of the written lease effectively deprived Charlie of his right to retain possession of his property, which he shared with Brittany according to the lease. When the Tonya closed Laura's agent account in December 2018, Charlie, Laura and Brittany were left without adequate income or finances to pay their bills.

3.46   At the time, Charlie, Laura, and Brittany were working together at CT Thrash Differential and Axle Service at 4838 West Avenue, San Antonio, Texas. When Tonya locked Charlie out of his shop, she violated Charlie's rights pursuant to the Texas Estates Code Section 1151.051 and the Order appointing guardian, which was expressly subject to the Ward's Bill of Rights. Charlie had a right to possession of his property and to engage in his livelihood to the extent of his ability.

3.47   Laura and Brittany allege and would prove that Tonya's actions changing the locks and closing the business caused harm, injury and damages to Charlie and his estate because it deprived him of his livelihood and hobby activities, sources of income, and business goodwill.

3.48   Tonya also violated Brittany's rights as an employee and tenant under her long term Commercial Gross Lease to the property, which was executed on October 1, 2018.

3.49   Tonya wrongfully excluded Charlie, Brittany, Laura, their employees and their customers from the property and prevented them from removing their vehicles, tools and equipment and other personal property.

3.50   Prior to changing the locks at Charlie's shop, Tonya did not present any demand for rent or prior notice. On February 12, 2019, Tonya refused Brittany's tender of $2,400.00 cash for back rent pursuant to the Notice of Change of Locks pursuant to the Texas Property Code Section 93.002(f). (A true and correct copy of the Notice of Change of Locks is attached hereto as Exhibit "F" and incorporated herein for all purposes).

3.51   Brittany alleges and would prove that she was ready, willing and able to pay all rent due and owing under the lease, and she tendered back rent, but Tonya refused to accept payment.

3,.52  Brittany and Laura allege and would prove that Tonya's actions in her capacity as guardian of Charlie's estate have caused and continue to cause actual damages including loss of employment and rental income as well as irreparable harm and injury to Charlie's person and estate, which Probate Judge Oscar J. Kazen (Judge Kazen) should have stopped immediately in order to protect Charlie

from further violations of his rights under the Texas Estates Code including the Bill of Rights of Wards Section 1151.051.

3.53    In particular, Brittany and Laura allege and would prove that Tonya's actions locking Charlie and his employees, friends and customers from CT Thrash Differential and Axle Service at 4838 West Avenue, San Antonio, Texas caused Charlie, Laura and Brittany to suffer extreme emotional distress and anxiety including depression, frustration, anger, disappointment, unhappiness, fear, financial embarrassment, loss of commercial good will, loss of opportunity for social interaction, loss of employment, loss of enjoyment of life, loss of opportunity to engage in hobby activities, loss of self esteem and loss of opportunity to preserve and/or restore his capacity for life, self determination and financial independence.

3.54    Brittany and Laura further allege and would prove that since the probate court revoked Charlie's durable and medical powers of attorney and appointed Tonya as permanent guardian of his estate, Charlie was deprived of adequate financial support and prevented from enjoying his usual and customary life activities including functioning as a happy, healthy human being, fully engaged in rewarding activities of his choice, supervising employees, going to auto races, traveling, and training and mentoring Brittany as an auto and aircraft mechanic. Tonya also prevented Charlie from interacting with customers and visiting with

friends in the social setting of his business, which he built into a respected automobile specialty repair shop over a period of sixty years.

3.55  On January 16, 2019, Dr. Manuel Naron, M.D., Charlie's treating physician, wrote a letter "To whom it may concern" stating his professional opinion of Charlie's medical condition and Charlie's competence. Dr. Naron's letter was based on his personal observations including recent visits and conversations. Dr. Naron stated that Charlie's chronic medical problems include diabetes and anxiety. Nevertheless, Dr. Naron stated that Charlie is capable of making financial and healthcare decisions for himself. Furthermore, Charlie still has the capacity to care for himself regarding activities of daily living and is able to participate and enjoy hobbies and work pertaining to his automotive shop. (A true and correct copy of Dr. Naron's medical opinion letter dated January 16, 2019 is attached hereto as Exhibit "G" and incorporated herein for all purposes).

3.56  Within a few days after Dr. Naron wrote his medical opinion of Charlie's capacity, Judge Kazen read the mental capacity report. When Judge Kazen read Dr. Naron's report, he knew or should have known that there was evidence of changed circumstances, which showed that Charlie was not totally incapacitated.

3.57  Laura and Brittany allege and would prove that Judge Kazen was negligent and grossly negligent in failing to use reasonable diligence to determine whether Tonya and/or Mary were performing all of the duties required of the guardians that

relate to Charlie, under the facts and circumstances, which indicated that Charlie was not totally incapacitated.

3.58   On January 29, 2019, Judge Kazen considered competing motions for new trial and granted Tonya's motion to remove Laura and appoint Mary Werner as guardian of Charlie's person. Judge Kazen also ruled that Charlie was totally incapacitated without acknowledging his awareness of Dr. Naron's written mental competency report.

3.59   On January 29, 2019, Judge Kazen failed or refused to appoint a guardian ad litem, notwithstanding the fact that Charlie did not have a guardian ad litem to protect his best interests at the motion for new trial. The Court ruled without considering legally or factually sufficient evidence to support its findings "by clear and convincing evidence" that:

> \* Alternatives to Guardianship and supports and services available to the Ward that would avoid the need for guardianship have been considered and determined not to be feasible;
>
> \* The respective Guardians should be granted the full powers and authority over the Ward allowed under the Texas Estates Code;
>
> \* The rights of the Ward should be fully limited, including the right to vote in a public election and the right to drive a motor vehicle;

* The Ward is totally without capacity to care for himself, manage his property, operate a motor vehicle, vote in a public election, make personal decisions regarding residence, to contract, and to marry;

* The Ward is an incapacitated person as defined by Section 1002.017 of the Texas Estates Code, who has no legal Guardian of his person and estate, such incapacity being evidenced by recurring acts or occurrences within the preceding six-month period and not by isolated instances of negligence or bad judgment;

*  It is in the best interest of the Ward to have the Court appoint persons as his Guardian; and

* The rights of the Ward and his property will be protected by the appointment of Guardians.

3.60  Laura and Brittany respectfully submit that Judge Kazen's Order granting Tonya's motion for new trial erroneously stated that Charlie did not have a legal guardian of his person or estate, when Laura was the guardian of his person and Tonya was the guardian of his estate. The Order did not state that Laura was being removed as guardian of the person or legally or factually sufficient grounds for removal.

3.61  Furthermore, Judge Kazen ruled without consideration of Charlie's preference for Laura to be the guardian of his person, which fact the probate court had taken judicial notice at the hearing on July 12, 2018, as well as his rights to due process and equal protection and rights under the Texas Estates Code and the Bill of Rights of Wards.

3.62   On January 31, 2019, Charlie submitted a hand-written letter to the Court requesting restoration of his capacity and/or modification or termination of the guardianship. (A true and correct copy of Charlie's January 31, 2019 hand-written letter to Judge Kazen is attached hereto as Exhibit "H" and incorporated herein for all purposes).

3.63   On February 4, 2019, Judge Kazen arbitrarily and unreasonably failed or refused to consider Charlie's January 31, 2019 hand-written letter to the Court requesting restoration of capacity, or alternatively, modification or settling and closing the guardianship. Judge Kazen told Charlie on the record that he had to wait a year before trying to restore his capacity or modify the guardianship without mentioning that he could grant special leave to consider a motion for restoration or modification based on changed circumstances in less than a year. Furthermore, Judge Kazen did not disclose the fact that he already knew about Dr. Naron's written medical opinion of Charlie's current mental capacity.

3.64   Brittany and Laura allege and would prove that after Tonya and Mary were appointed permanent guardians of Charlie's person and estate, they acted without regard for Charlie's preferences and statutory rights, and they cut Charlie off or attempted to prevent him from many of his usual and customary life activities and opportunities to retain and/or restore his capacity, such that Charlie suffered extreme hardship and loss of enjoyment of life.

3.65   Laura and Brittany further allege and would prove that Judge Kazen neglected and grossly neglected to use reasonable diligence to determine whether Tonya and/or Mary were performing all of the duties required of the guardians that relate to Charlie, under the facts and circumstances.

3.66   On February 1, 2019, Charlie filed a motion for temporary restraining order and temporary injunction.

3.67   On or about February 6, 2019, Mary told Charlie that she was going to send a registered nurse to his house four times per day. Then, Charlie sent another letter to Judge Kazen stating that he did not need a nurse or home health care services. (A true and correct copy of Charlie's February 8, 2019 hand-written letter to Judge Kazen is attached hereto as Exhibit "I" and incorporated herein for all purposes).

3.68   Brittany and Laura also allege and would prove that Tonya attempted to wrongfully evict Brittany and Charlie from Charlie's aircraft hangar at the Boerne Airport in violation of the Rights of Wards as well as Brittany's tenant rights. On February 6, 2019, Tonya filed her Plaintiff's Second Amended Petition and Complaint of Forcible Detainer, Cause No. 31E1900385 in the Justice Court, Precinct 3, Bexar County, Texas. Such action violated Charlie's rights under the Estates Code 1151.051 and the Order appointing guardian, which was expressly subject to the Ward's Bill of Rights.

3.69 Brittany and Laura allege and would prove that Charlie had a right to possession of his aircraft hanger and his airplanes under the Ward's Bill of Rights, and that was his preference, which was disregarded by Tonya, when she filed her eviction lawsuit.

3.70 On February 8, 2019, Judge Kazen conducted a hearing to consider Charlie's request for temporary restraining order and temporary injunction. Judge Kazen ruled that Charlie had been adjudicated to lack capacity to hire the undersigned attorney or consent to the hiring of the undersigned attorney by Laura. Judge Kazen also ruled that the motion to restore capacity was premature, since less than a year had elapsed since the guardians were appointed. However, Judge Kazen appointed attorney Elaine Damian (Elaine) as Court Investigator to investigate Charlie's claims and allegations and submit a report to the Court.

3.71 On February 14, 2019, Tonya dismissed the eviction action without prejudice after Brittany filed a motion for writ of re-entry, and the Justice Court entered an Order dismissing Plaintiff's Second Amended Petition and Complaint of Forcible Detainer in Cause No. 31E1900385 in the Justice Court, Precinct 3, Bexar County, Texas.

3.71 On February 15, 2019, Laura and Brittany filed a motion for temporary restraining order and temporary injunction, and Judge Kazen ruled that a

temporary restraining order would be denied, but the motion for temporary injunction would be set for hearing within 10 or 11 days.

3.72   On February 15, 2019, the Court Investigator Elaine Damian visited Charlie and Laura at their home at 310 Harvard Oak, Shavano Park, Texas 78231. This was the initial visit after being appointed by the Court. Elaine told Charlie that he should be very careful about his association with the undersigned counsel, that this was a fight about Charlie's life, but that the undersigned counsel had his own agenda, which was adverse to Charlie's interests, and that someone was already mad about it. She also told Charlie that other lawyers could do a better job than the undersigned counsel.

3.73   On February 15, 2019, Judge Kazen also signed an Order setting a monthly allowance. However, Laura and Brittany allege and would prove that Judge Kazen was aware that Tonya had not paid most of Charlie's bills since her appointment on November 15, 2018, and that she waited a week before disbursing about $275 cash, which was an insignificant amount compared with Charlie's financial needs.

3.74  Nevertheless, Judge Kazen neglected and grossly neglected to use reasonable diligence to determine whether Tonya continued to fail or refuse to provide adequate financial support to Charlie as required to maintain his lifestyle within his means. Judge Kazen's continued to neglect and gross neglect to use reasonable diligence to determine whether Tonya's persistent failure or refusal to

provide adequate support caused Charlie to experience distress and anxiety as well as physical pain and suffering.

3.74   Under the circumstances, Laura determined that it was necessary to file a complaint with Texas Adult Protection Services due to alleged neglect and abuse of Charlie by Tonya due in part to her failure or refusal to provide necessary finances for basic needs, which violated the probate court's November 15, 2018 Order appointing guardian of the estate and Charlie's rights pursuant to the Texas Estates Code Section 1151.351 Ward's Bill of Rights.

3.75   On February 16, 2019, Charlie submitted a hand-written letter to Judge Kazen requesting special leave to file a motion for restoration of his capacity and/or modification or termination of the guardianship.  (A true and correct copy of Charlie's February 16, 2019 hand-written letter to Judge Kazen is attached hereto as Exhibit "J" and incorporated herein for all purposes).

3.76   On February 19, 2019, Brittany tendered $400 cash payment for rent on the aircraft hanger to Tonya, but she refused to accept payment. Additionally and alternatively, Brittany and Laura also allege and would prove that Tonya knew about the written lease for CT Thrash Differential and Axle Service, 4838 West Avenue, San Antonio, Texas because Tonya's attorney produced a copy of a draft lease at the hearing on Brittany's motion for writ of re-entry in the Justice Court, Precinct 2, Bexar County, Texas.

3.77  Furthermore, Brittany and Laura allege and would prove that Judge Kazen was aware that Charlie wanted to restore his living and working conditions and arrangements as they were before the guardianship including possession of all of his vehicles and possession of his residence/auto repair shop and residence/aircraft hangar and condominium for his benefit and enjoyment.

3.78  Judge Kazen was also aware that Charlie desired to receive rental income from his various rental properties was well as his social security checks so that he could continue to manage his personal finances with appropriate supports and services to the extent of his ability.

3.79  Alternatively, Brittany and Laura allege and would prove that Judge Kazen was aware that Charlie wanted Laura reinstated as his agent pursuant to his durable power of attorney until he can restore his legal capacity.

3.80  Brittany and Laura allege and would prove that Mary Werner, acting as guardian of the person, also violated Charlie's protected rights and preferences, such that she should have been removed as guardian of Charlie's person.

3.81  Brittany and Laura allege and would prove that Mary caused Charlie to experience extreme emotional upset, distress and anxiety as well as physical pain and suffering by attempting to compel Charlie to submit to her demands to go shopping, dining and other places against his will.

3.82   On February 19, 2019, Brittany and Laura filed a second amended motion for temporary restraining order and temporary injunction, which was denied at a hearing that afternoon, but Judge Kazen set a hearing for February 22, 2019 to reconsider the motion, when opposing counsel could be present. Charlie filed another letter to Judge Kazen requesting special leave to apply for restoration of his legal capacity. (A true and correct copy of Charlie's February 19, 2019 hand-written letter to Judge Kazen is attached hereto as Exhibit "K" and incorporated herein for all purposes).

3.83   On February 21, 2019, Charlie and Laura obtained a marriage license.

3.84   On February 22, 2019, when Judge Kazen considered Laura and Brittany's corrected amended verified motion for temporary restraining order, Judge Kazen ruled without allowing any new testimony or evidence to be admitted. Although Judge Kazen stated that he would not consider the motion for temporary injunction at the hearing, he signed an Order denying temporary restraining order and temporary injunction.

3.85   Judge Kazen's refusal to consider evidence that Tonya locked Charlie, Laura and Brittany out of their automotive business and closed the business neglected and grossly neglected to use reasonable diligence to determine whether Tonya was performing all of the duties required of the guardians that relate to Charlie including allowing him to work and engage in his livelihood and hobby

activities at his automotive repair shop.

3.86   Judge Kazen signed an Order denying the Second Verified Motion for Temporary Restraining Order and Temporary Injunction, which was tendered by Tonya's attorney. However, the Second Verified Motion for Temporary Restraining Order and Temporary Injunction was superseded, when Laura and Brittany filed their Corrected Amended Verified Motion for Temporary Restraining Order, Temporary Injunction and Permanent Injunction prior to the hearing on February 22, 2019.

3.87   On February 24, 2019, Charlie and Laura met with Reverend Gilbert Guzman, a Church minister to discuss their marriage plans.

3.88   On February 25, 2019, Brittany and Laura filed a written objection to the Court's February 22, 2019 Order denying temporary injunctive relief.   Charlie filed another letter to Judge Kazen requesting two independent medical examinations regarding his capacity. (A true and correct copy of Charlie's February 25, 2019 hand-written letter to Judge Kazen is attached hereto as Exhibit "L" and incorporated herein for all purposes).

3.89   On February 28, 2019, the Court entered a corrected Order denying temporary restraining order and temporary injunction.

3.90   On February 28, 2019, Charlie submitted another hand-written letter to Judge Kazen stating that he had obtained a marriage license, spoken with a

minister, and wanted to marry Laura, but that he needed to get back to work, earn some money and have this guardianship terminated. Included with the letter was a copy of the marriage license and video recording of Charlie and Laura's interview with the minister. (True and correct copies of Charlie's February 28, 2019 letter to Judge Kazen, Charlie and Laura's marriage license and video recording of their interview with the minister are attached hereto as Exhibit "M" and incorporated herein for all purposes).

3.91   On February 28, 2019, after Brittany and Laura filed a written objection to the February 22, 2019 Order denying temporary relief, Judge Kazen set that Order aside and entered a corrected Order denying temporary injunctive relief.

3.92   On March 4, 2019, Charlie and Laura went to the Social Security office to inquire about Charlie's Social Security account, and they were advised that Tonya had applied for Charlie's checks to be sent to herself instead of Charlie's agent under his durable power of attorney because Tonya claimed to be both the guardian of his person and guardian of his estate in December 2018. Laura and Charlie advised the Social Security agent that Tonya was only appointed as guardian of Charlie's estate and Laura was appointed guardian of his person. So, the Social Security agent told Charlie and Laura to come back early the next day and bring documentation.

3.93   Later that day, Charlie and Laura decided that they could not wait until the guardianship was settled and closed before getting married in a religious ceremony. So, they met with Reverend Gilbert Guzman again and exchanged marriage vows in a religious ceremony on March 4, 2019, notwithstanding the fact that they were already married under Texas common law. (True and correct copies of the marriage license and certificate as well as a recording of their wedding ceremony are attached hereto as Exhibit "N" and incorporated herein for all purposes).

3.94   The next day, Charlie and Laura went back to the Social Security office with a certified copy of the November 15, 2018 Order appointing guardians as well as the February 15, 2019 Order setting a monthly allowance. The Social Security agent advised them that there would be an investigation into the matter because it appeared that Tonya had misrepresented her capacity as guardian of the person, and Mary had not contacted Social Security to register her appointment.

3.95   Charlie and Laura also advised the Social Security agent that they had gotten married in a religious ceremony officiated by a church minister, and they intended to adopt Laura's adult children. The Social Security agent told them to bring official copies of the relevant documents regarding the marriage and adoptions.

3.96  On March 5, 2019, Charlie and Laura's marriage license was recorded in the official public records of DeWitt County, and Charlie and Laura adopted Laura's adult children Brittany and Jose Martinez. (True and correct copies of the file-stamped Decrees of adoption are attached hereto as Exhibit "O" and incorporated herein for all purposes).

3.97  On March 6, 2019, Brittany and Laura filed a supplement to their second amended motion to remove guardians and attached true and correct copies of Charlie's marriage certificate, recorded marriage license and decrees of adoption. A few hours later, Charlie answered his cell phone and received a call from Detective Stephani Wade, Shavano Police Department, demanding that Charlie and Laura return home as soon as possible because Mary had requested a welfare check on Charlie.

3.98  When Charlie and Laura arrived home within about an hour, they called Det. Wade to advise that they were home and were ready for a welfare check. Soon, they were met with about six Shavano Park police officers including Det. Wade and Mary, who told Charlie and Laura that Charlie needed to gather his clothes and medicines and go with Mary. Charlie repeatedly objected to going with Mary, but he was intimidated by the group of police officers inside and outside his home. Mary did not produce any court order, writ of attachment or warrant, which might authorize her actions under color of authority of state law

under the circumstances. The only court order known to Laura and Brittany was the Order appointing her as his guardian.

3.99 However, there was no emergency that would authorize police action to assist Mary in taking possession of Charlie against his will under the circumstances. Charlie and Laura had recently checked his blood sugar, which was under control, and he was not under any medical or mental distress. He was not in danger or threat of harm or injury. When Laura asked Mary where she was taking Charlie, she refused to tell Charlie and Laura where she was taking him.

3.100 Brittany and Laura allege and would prove that Mary and the Shavano Park police department engaged in official oppression, when they coerced Charlie to go with Mary, notwithstanding his verbal objections. Laura confirmed that the officers had their body cameras on, which they acknowledged. So, there should be recorded audio-video recordings of the incident.

3.101 Brittany and Laura allege and would prove that Mary is married to the Shavano Park mayor Robert Werner, and that she used her political influence to get assistance from the Shavano Park Police Department to officially oppress and intimidate Charlie and Laura, which enabled Mary to take Charlie from his home against his will.

3.102 Later that same evening, the undersigned counsel and Laura attempted to get assistance from various law enforcement agencies. After the undersigned

counsel spoke to the Shavano Park Police Department and requested a welfare check to determine whether Charlie was safe, and the request was denied, Laura filed a complaint to Officer J. Galvan, Badge No. 414, Case # SAPD-2019-0271254, with the San Antonio Police Department alleging official oppression by Mary and the Shavano Park Police Department.

3.103 The next morning, March 7, 2019, Laura and the undersigned counsel met with the Shavano Park Police Chief Ray Lacy, who told them that a grievance would be filed against the undersigned counsel for assisting Charlie to get married and that the marriage would be annulled. Chief Lacy also told Laura and the undersigned counsel that there was an order from a district judge that authorized his department's actions assisting Mary to remove Charlie from his home against his will.

3.104 Then, Laura filed a complaint with the Shavano Park Police Department requesting an internal affairs investigation of the alleged official oppression by Det. Stephani Wade and five unidentified Shavano Park police, who assisted Mary to take possession of Charlie and remove him from his home against his will. Laura also requested the police department to preserve all audio/video evidence related to the incident.

3.106 That same day, Laura took her original marriage certificate and recorded marriage license as well as certified copies of the two decrees of adoption for Brittany and Jose Martinez to the Social Security office.

3.107 Later that day, Laura and Brittany filed their second amended verified motion for temporary restraining order and temporary injunction, and requested an immediate hearing, or alternatively, a hearing at the earliest available date. The undersigned counsel was informed by Martin Collins, law clerk for Judge Oscar Kazen, that the earliest date for a hearing on the motion for TRO was April 1, 2019. This information was confirmed by Judge Kazen, who convened a brief hearing on the record and ruled that the request for ex-parte TRO was denied, and the earliest available date for a hearing on the motion was April 1, 2019.

3.108 Judge Kazen's refusal to consider evidence that Mary had engaged in official oppression with the Shavano Park Police Department and abducted Charlie from his home neglected and grossly neglected to use reasonable diligence to determine whether Mary was performing all of the duties required of the guardian that relate to Charlie including allowing him to remain in his home with his wife and adult children.

3.109 On March 7, 2019, Laura and the undersigned counsel also went to the Bexar County District Attorney and requested an investigation of the March 6, 2019 incident at 310 Harvard Oak, Shavano Park, Texas including alleged official

oppression. They spoke with three investigators, one of whom checked the official records of the District Clerk looking for a court order, which may have authorized police action to assist Mary to take possession of Charlie against his will. No such court order was found.

3.110 Laura and the undersigned counsel also requested the Bexar County Sheriff Department to make a complaint against Mary, Det. Wade and the Shavano Park Police, but their request was denied by the shift supervisor.

3.111 Laura also spoke with Adult Protective Service investigator Bridgett Wilson and requested an investigation and welfare check to confirm where Charlie was located and whether he was safe. Ms. Wilson stated that she had not yet located Charlie or spoken to him.

3.112 On March 7, 2019, Karen Andersen, attorney for Tonya, sent an email to Laura and the undersigned counsel demanding that Laura provide titles and keys to all of Charlie's motor vehicles including cars, trucks, motorcycles and airplanes, stating that the guardian intends to take possession of all of Charlie's property. Ms. Andersen also requested the undersigned counsel to put the Martinez family on notice that removal or transportation of any estate asset for any purpose will result in criminal and civil charges.

3.113 Laura and Brittany allege and would prove that Judge Kazen was aware that Charlie did not want the titles and keys to his vehicles turned over to Tonya or her

attorney, and he wanted to keep possession of all of his motor vehicles including cars, trucks, motorcycles and airplanes, which he had a right to do because that was his preference and his estate could afford the expense.

3.114 On March 8, 2019, the undersigned counsel checked with the District Clerk, County Clerk and Probate Clerk in order to determine whether there was any recorded order authorizing the Shavano Park Police Department to assist Mary to take possession of Charlie against his will on March 6, 2019. The only record that was discovered was the order removing Laura and appointing Mary as guardian of Charlie's person.

3.115 Then the undersigned counsel conferred with Martin Collins and told him about the alleged official oppression by the Shavano Park Police Department, which assisted Mary to take possession of Charlie against his will, when there was not any emergency, and take him to an undisclosed location. Mr. Collins stated that he did not know where Charlie was, but he would check into it.

3.116 Mr. Collins also mentioned that there should be an inventory of Charlie's estate, which was due to be filed by Tonya. Upon review of the Docket Sheet in this proceeding, it appeared that Tonya had not filed an inventory within thirty days of her qualification and oath as guardian of Charlie's estate, and she had not requested an extension of time. Therefore, Laura and Brittany allege and would prove that Tonya has violated the mandatory requirement of the Texas Estates

Code Section 1154 to file an inventory, appraisement and list of claims pursuant to Section 1154.051, such that she should be removed as guardian of Charlie's estate.

3.117 Later on the afternoon of March 8, 2019, Laura went to the Constable, Precinct Three and met with Officer Robert Hardcastle, Badge No. 1317. After conferring with Constable Deputy Hardcastle, Laura filed complaint number 2019-CO3-000127 complaining of official oppression by the Shavano Park Police Department, Det. Stephani Wade and Mary Werner.

3.118 Brittany and Laura further allege that Mary's wrongful conduct was antagonistic to Charlie's health, safety and well-being; that she neglected his medical needs; that she failed or refused to provide adequate financial support; that she continued to violate Charlie's statutory rights; and that she treated Charlie like he was totally incapacitated, when he was not, which disrespected his ability to take care of himself and disregarded Charlie's family's supports and services.

3.119 On March 8, 2019, the Court Investigator filed her report, which was biased, inadequate and inaccurate because she disregarded facts related to the actions of the guardians in violation of Charlie's protected rights to work at his livelihood and hobby activites, retain and restore his capacity, and depend on himself and foster his independence to the extend of his ability. The Court Investigator's report created a false impression of Charlie's capacity and best interests because it failed or refused to consider medical evidence of mental capacity including Dr. Naron's

January 16, 2019 report. Laura and Brittany filed verified objections and rebuttal evidence and argument to the Court Investigator's report, but Judge Kazen later ordered their pleadings and evidence stricken from the record. (A true and correct copy of Laura and Brittany's objection and rebuttal to the Court Investigator's report is attached hereto as Exhibit "P" and incorporated herein for all purposes).

3.120 Brittany and Laura allege and would prove that Charlie needed to have his guardians removed without further delay because their actions were antagonistic to his best interests including his statutory rights under the Texas Estates Code Section 1151.351 (Ward's Bill of Rights).

3.121 Judge Kazen's refusal to consider evidence filed by Laura and Brittany showing proof in support of their motion to remove the guardians neglected and grossly neglected to use reasonable diligence to determine whether Tonya and Mary were performing all of the duties required of the guardians that related to Charlie including allowing him engage in his livelihood and hobby activities at his automotive shop and to continue to live in his home with his wife and adult children.

3.122 Likewise, Judge Kazen's refusal to consider evidence filed by Laura and Brittany showing proof in support of their motion for leave to restore Charlie's legal capacity and/or modify, close and settle the guardianship neglected and grossly neglected to use reasonable diligence to determine whether Tonya and

Mary were performing all of the duties required of the guardians that related to Charlie including providing a guardianship that will encourage and allow maximum self-sufficiency and full exercise of freedoms and liberties under the Ward's Bill of Rights with the goal of independence within Charlie's actual mental or physical restrictions, according to Charlie's best interests.

3.123 On March 14, 2019, Judge Kazen signed an ex parte temporary restraining order, which enjoined Laura, Brittany, Joe, and Michelle from having contact with Charlie or going within 500 feet of his property including the residences, where they lived.

3.124 Judge Kazen also enjoined the undersigned counsel from having contact with Charlie.

3.125 On March 15, 2019, Judge Kazen ruled that Charlie and Laura's marriage was annulled without allowing any evidence stating that the marriage was void, notwithstanding evidence already in the record that Charlie and Laura were already married under Texas common law and a 2014 Texas Supreme Court decision that "An adjudication of incapacity in a guardianship proceeding fixes the individual's status as an incapacitated person at that time." *In the Interest of K.M.L., a child*, 443 S.W.3d 101, 112 (Tex 2014) citing *Evans v. Allen*, 358 S.W.3d 358, 368 (Tex.App.-Houston [1st Dist.] 2011, no pet.) ; *Kokes v. College,* 148 S.W.3d 384, 389 (Tex.App.-Beaumont 2004, no pet.) ; *Quada v. Quada*, 396

S.W.2d 232, 233 (Tex.App.-Texarkana 1965, no writ). "Further, this determination is merely a rebuttable presumption that the legal incapacity will be that person's condition at any given time thereafter in the absence of facts showing reason has been restored." *In the Interest of K.M.L.*, at 112.

3.126 Laura and Brittany respectfully submit that Judge Kazen's ruling that the marriage was void was not only a mistake of law but also showed callous indifference to Charlie and Laura's rights to due process. To wit, Charlie was not present at the hearing, he had no guardian ad litem, and he had no legal assistance from independent counsel, notwithstanding evidence that he did not lack mental capacity, and he had submitted a written request to the Court to allow the undersigned counsel to represent him or to appoint an attorney ad litem. Furthermore, Judge Kazen made his ruling on the law notwithstanding evidence already in the record that Charlie and Laura were married under Texas common law and the obvious fact issue whether Charlie had the current mental capacity to marry Laura on March 4, 2019. *Id.*

3.127 On March 15, 2019, Judge Kazen also ruled that he was going to appoint attorney K.T. Whitehead as guardian ad litem. However, Judge Kazen did not sign an order appointing a guardian ad litem.

3.128 On April 9, 2019, Judge Kazen granted the guardians' objections and motion to strike pleadings filed by Laura, Brittany and the undersigned counsel

finding that they had not intervene into the guardianship because they had not complied with the Texas Estates Code Section 1055.103. However, Laura and Brittany allege and would prove that they were exempted from compliance with Section 1055.003 because Laura was Charlie's agent pursuant to his June 24, 2016 powers of attorney, and she was his life partner and/or common law wife and/or business partner. Brittany was Charlie's tenant and business partner.

3.129 Judge Kazen's April 9, 2019 Order effectively removed all pleadings and evidence supporting Laura and Brittany's motions to restore Charlie's capacity and/or modify, close and/or settle the guardianship and to remove the guardians.

3.130 On April 12, 2019, Judge Kazen admitted evidence at the hearing on the guardians' request for temporary injunction including 12 audio-video recordings depicting Charlie engaged in his livelihood and hobby activities at his automotive repair shop from October 2018 through January 2019 as well as audio-video recordings of Charlie and Laura's marriage counseling and wedding ceremoney. Nevertheless, Judge Kazen refused to consider the audio-video recordings as evidence of Charlie's mental capacity, and he granted the guardians' request for temporary injunction, thereby enjoining Laura and Brittany from having any contact with Charlie, going within 500 feet of his property, notwithstanding the fact that two of Charlie's properties were their homes, and having anything to do with the guardianship. (True and correct copies of the Ex Parte Temporary

Restraining Order, dated March 14, 2019, and the Temporary Injunction are attached hereto as Exhibits "Q" & "R" and incorporated herein for all purposes).

3.131 Laura and Brittany allege and would prove that Tonya and Mary constructively broke up their family relationship with Charlie under "color of authority of state law" pursuant to Judge Kazen's orders and wrongfully enjoined them from providing less restrictive alternatives to guardianship including Charlie's valid powers of attorney and supports and services.

3.132 Therefore, Laura and Brittany allege and would prove that Tonya and Mary violated Charlie, Laura and Brittany's federally protected rights to freedom of speech and association regarding matters of general public concern as well as their rights to due process and equal protection, which were facilitated by Judge Kazen's neglect and gross neglect to use reasonable diligence to determine whether Tonya and/or Mary were performing all of the duties required of the guardians that relate to Charlie, under the facts and circumstances.

3.133 In summary, Laura and Brittany allege and would prove that Tonya and Mary violated Charlie's protected rights under the Texas Estates Code, Sec. 1151.351 "BILL OF RIGHTS FOR WARDS" by the following acts and/or omissions:

    a    causing Laura to be removed as guardian of the person and

        causing Mary to be appointed as guardian of the person without

appointment of a guardian ad litem or consideration of Charlie's preference;

b      failing to consider Charlie's request for retained or appointed counsel;

c      violating Charlie's protected rights including his right to work after tonya locked him out of his shop and closed his business, which was operating under Charlie's supervision at the time;

d      taking possession of Charlie's personal property after Tonya's attorney demanded titles and keys to all of his motor vehicles;

e      wrongfully taking physical possession of Charlie under circumstances that implicate official oppression by six Shavano Park police officers helping Mary convince Charlie to go with her against his will and hold him at an undisclosed location without contact with members of Charlie and Laura's household;

f      causing Charlie's marriage to Laura to be declared void without affording Charlie the right to be present at the hearing or to be represented by a guardian ad litem and attorney ad litem;

g      obtaining ex parte injunctive relief ordering Laura, Brittany and other members of Charlie's household to deliver titles and keys to all of Charlie's motor vehicles, notwithstanding Charlie's repeated

objections to releasing possession of his cars, trucks, motorcylcles and airplanes to his guardian;

h    causing Laura, Brittany and other members of Charlie's household to be immediately restraining from going within 500' of their residences and/or place of prior employment at CT Thrash Differential and Axle Service, 4838 West Ave., San Antonio, Texas, notwithstanding notices posted by the guardian for Laura and other members of Charlie's household to vacate the premises by April 15, 2019;

i    restraining Laura, Brittany and other members of Charlie's household from attempting to speak to Charlie or associate with him, and

j    restraining Laura, Brittany and other members of Charlie's household from publicly advocating for Charlie's protected statutory rights.

3.134 As a proximate result of Tonya and Mary's violations of Charlie, Laura and Brittany's federally protected rights of free speech and association and due process and equal protection "under color of authority of state law", under the facts and circumstances, Charlie, Laura and Brittany have suffered financial damages due to loss of employment and breach of contract and partnership rights as well as extreme emotional distress and anxiety including depression, frustration, anger, disappointment, unhappiness, fear, financial embarrassment, loss of commercial

good will, loss of opportunity for social interaction, loss of employment, loss of enjoyment of life, loss of opportunity to engage in hobby activities, loss of self esteem and loss of opportunity to preserve and/or restore his capacity for life, self determination and financial independence.

## IV. CAUSES OF ACTION

4.1 <u>Uncontitutional retaliation under the First and Fourteenth Amendments</u>:

A. <u>Deprivation or infringement of protected communication and/association</u>. Plaintiffs are suing under 42 U.S.C. § 1983 for an award of nominal and/or actual damages against Defendants Mary and Tonya, individually and as guardians of Charles I. Thrash, acting "under color of state law" pursuant to an official policy, practice, custom or decision, for violations of rights, privileges and immunity under the First and Fourteenth Amendments including freedom of speech and association, freedom from discrimination on the basis of perceived disability or "legal incapacity," due process and/or equal protection.

Plaintiffs allege and would prove that Tonya and Mary's unlawful actions deprived or infringed Plaintiffs' federally protected rights to speak and associate with each other and Charlie and to assist Charlie to maintain and/or restore his capacity, personal preferences, and usual and customary living and working environment as well as to protect his state and federal rights and advocate for the restoration of his legal capacity, removing the guardians and closing and settling the guardianship.

Plaintiffs also allege and would prove that Tonya and Mary's unlawful actions deprived or infringed Plaintiffs' federally protected rights to speak and associate with each other regarding matters of general public concern including advocating for Charlie's welfare on public media including posting pictures and videos of Charlie on the Internet.

B. <u>Retaliation for protected communication</u>.  Plaintiffs are suing under 42 U.S.C. § 1983 for an award of nominal and/or actual damages against Defendants Mary and Tonya, individually and as guardians of Charles I. Thrash, acting "under color of state law" pursuant to an official policy, practice, custom or decision, for violations of rights, privileges and immunity under the First and Fourteenth Amendments including freedom of speech and association, freedom from discrimination on the basis of perceived disability or "legal incapacity", due process and/or equal protection.

Plaintiffs allege and would prove that Tonya and Mary's unlawful actions depriving or infringing Plaintiffs' federally protected rights to speak and associate with each other and Charlie were motivated by retaliation for Plaintiffs' actions assisting Charlie to maintain and/or restore his capacity, personal preferences, and usual and customary living and working environment as well as to protect his state and federal rights and advocate for the restoration of his legal capacity, removing the guardians and closing and settling the guardianship.  Plaintiffs also allege and would

prove that Tonya and Mary's unlawful actions depriving or infringing Plaintiffs' federally protected rights to speak and associate with each other regarding matters of general public concern including advocating for Charlie's welfare on public media were motivated by retaliation for Plaintiffs' posting pictures and videos of Charlie on the Internet.

C.    <u>Denial or infringement of freedom of speech and association regarding marriage and family relationship.</u>

Plaintiffs allege and would prove that Defendants had a duty to provide Charlie with a guardianship that will encourage and allow maximum self-sufficiency and full exercise of freedoms and liberties under the Ward's Bill of Rights with the goal of independence within Charlie's actual mental or physical restrictions, according to Charlie's best interests. Tonya and Mary also had a duty to uphold Charlie's federally protected civil rights and not to engage in a conspiracy to interfere with the lawful and free exercise thereof. Tonya and Mary knew that Charlie, Laura and Brittany had federally protected rights to speak, associate and communicate with each other as an informal family and business partnership. Tonya and Mary also knew that they did not have a legal right to deny Charlie, Laura and Brittany's federally protected rights to speak and associate with each other and the general public. However, Tonya and Mary acted with deliberate indifference, recklessness, gross recklessness and/or malice, when it denied Charlie, Laura and Brittany's federally protected rights, privileges and immunity, which proximately

caused them to suffer damages and irreparable harm and injury.

The alleged deliberate and indifferent, negligent, grossly negligent, reckless and/or intentional failure or refusal to allow Charlie, Laura and Brittany to associate and communicate caused them to suffer physical pain as well as mental and emotional distress and anxiety under the facts and circumstances of this case. Therefore, Plaintiffs' claims are actionable under 42 U.S.C., Section 1983 because their injuries were more than de minimus and were caused by intentional deprivation of federally protected rights, privileges and immunity. In support of their claims the Plaintiffs allege and will prove each of the following by a preponderance of the evidence:

1       Defendants intentionally, arbitrarily or recklessly committed acts that violated one or more of Plaintiffs' clearly established federal constitutional or statutory rights;

2       In so doing, Defendants acted under color of state law;

3       Defendants acted pursuant to their official policy, practice, custom or decisions and/or orders of the probate court under "color of authority" of state law;

4       Defendants' actions include denial and/or infringement of Plaintiffs' rights to associate and communicate with each other and/or retaliation for exercising their federally protected rights, privileges and immunity; and

5       Defendants' actions "under color of State law" and their official policy, practice, custom or decisions and/or orders of the probate court were the legal causes

of Plaintiffs' injuries and damages.

4.2 Plaintiffs claim an award of nominal and/or actual damages pursuant to 42 U.S.C., Section 1983 as well as costs of court including reasonable and necessary attorney's fees pursuant to 42 U.S.C., Section 1988 regarding their claims for damages for violation of their rights and freedom under the First and Fourteenth Amendments.

4.3 Plaintiffs further allege and would prove that Tonya and Mary cannot show that they may be entitled to qualified or official immunity because their actions violated Plaintiffs' rights against unconstitutional deprivation of their rights to associate and communicate regarding matters of general public concern without retaliation, which were clearly established in this Circuit at the time of the incidents.

## V. DAMAGES

5.1 Plaintiffs incorporate the averments set forth above as if set forth verbatim for all purposes. Plaintiffs allege and would prove that they suffered nominal and/or substantial monetary damages as well as irreparable harm and injury as a result of Defendants' wrongful, tortious, unlawful, and/or negligent acts or omissions in the past.

5.2 Plaintiffs claim nominal damages for violations of their constitutional rights under the First and Fourteenth Amendments including freedom of association and speech, freedom from discrimination or retaliation on the basis of

disability, due process and/or equal protection.

5.3      Additionally and alternatively, Plaintiffs claim substantial monetary damages pursuant to their First and Fourteenth Amendment claims against Defendants Tonya and Mary, jointly and severally as individuals and in their capacities as guardian,s within the limits of their bonds. Plaintiffs allege and would prove that they have suffered damages proximately caused by the wrongful denial of freedom of association and speech; retaliation for publication of protected speech; discrimination and/or retaliation on the basis of disability; and denial of due process and/or equal protection, under the circumstances alleged in this case.

5.4    Plaintiffs also claim nominal and/or actual and exemplary damages against Tonya and Mary for their intentional and malicious denial of federally protected rights under the First and/or Fourteenth Amendments including wrongful denial of freedom of association and speech; retaliation for publication of protected speech; discrimination and/or retaliation on the basis of disability; and denial of due process and/or equal protection, under the circumstances alleged in this case.

5.5.    Plaintiffs claim a right to recover money damages from Defendants jointly and severally as individuals, and in their capacities as guardians, within the limits of their bonds, under the above listed theories of recovery.

5.6.    Plaintiffs request the Court to assess punitive or exemplary damages against

Defendants Tonya and Mary jointly and severally as individuals, and in their capacities as guardians, within the limits of their bonds, for intentional deprivation and retaliation with malice under the facts and circumstances of this case.

5.7    Plaintiffs also claim an award of pre-judgment and post-judgment interest according to law.

## VI.  INJUNCTIVE RELIEF

6.1    Additionally and alternatively, Laura and Brittany allege and would prove that they may be entitled to immediate preliminary and permanent injunctive relief.

6.2    To date, Charlie, Laura and Brittany been denied the opportunity to live and work together as a family and engage in their livelihood for the benefit of themselves and their customers. Their rights of free speech and association regarding the guardianship and advocating for Charlie's rights continue to be denied and/or infringed.

5.3    Continued delay directly affects Charlie, Laura and Brittany's ability to exercise their rights of free speech and association regarding the guardianship and advocating for Charlie's rights.

5.4    Tonya and Mary's actions pursuant to the temporary restraining order and temporary inunction in Cause No. 2017-PC-2912, Probate Court No. One, Bexar County, Texas, "under color of state law", caused and continues to cause

irreparable harm and injury including deprivation of property and denial of Charlie, Laura and Brittany's rights of free speech and association regarding the guardianship and advocating for Charlie's rights without due process pursuant to the Fourteenth Amendment, under the facts and circumstances of this case.

5.5    Tonya, Mary and Judge Kazen's continued violations of Charlie, Laura and Brittany's rights of free speech and association regarding the guardianship and advocating for Charlie's rights without due process pursuant to the Fourteenth Amendment caused and continues to cause irreparable harm and injury to Charlie, Laura and Brittany without due process pursuant to the Fourteenth Amendment including deprivation of free speech, association and property rights.

5.6    Charlie, Laura and Brittany submit that monetary damages against Judge Kazen are not available in this case and would not adequately compensate them for the harm they have sustained, are sustaining, or will sustain as a result of the events described above.

5.7    Charlie, Laura and Brittany further submits that monetary damages against Tonya and Mary would not adequately compensate them for the harm they have sustained, is sustaining, or will sustain as a result of the violations of their federally protected rights, privileges and immunity. Therefore, Charlie, Laura and Brittany may be entitled to injunctive relief.

5.8    Charlie, Laura and Brittany allege and would prove:

1) that there is a likelihood of irreparable harm with no adequate remedy at law;

2) that the balance of harm favors the movants;

3) that there is a likelihood of Charlie, Laura and Brittany's success on the merits of the case; and

4) that the public interest favors the granting of the injunction.

5.9    Therefore, Charlie, Laura and Brittany respectfully submit that it is necessary for this Court to grant emergency relief to protect them from irreparable harm and injury proximately caused by continuing denial and/or infringement of their fundamental rights to life, liberty and/or property without due process of law.

5.10   Specifically, Charlie, Laura and Brittany request this Court to grant emergency relief directing Tonya and Mary to allow Charlie, Laura and Brittany to resume their familial relationship pending further orders.

5.11   Additionally, Charlie, Laura and Brittany request this Court to order Tonya and Mary to restore the status quo ante by allowing Charlie, Laura and Brittany to move back into their home, hangar and automotive repair shop pending further orders.

5.12   After a final hearing on the merits, Charlie, Laura and Brittany request a permanent injunction restoring the status quo ante including enjoining Tonya and

Mary from violating Charlie, Laura and Brittany's federally protected rights, privileges and immunity in the future.

## VII. PREJUDGMENT AND POST JUDGMENT INTEREST

7.1     Charlie, Laura and Brittany allege and would prove that they have lost and/or will lose the opportunity to invest the sum of damages, which have been incurred or lost and may be awarded pursuant to a final judgment in this case.

7.2     Therefore they request an award of prejudgment and post judgment interest according to law.

## VIII. JURY DEMAND

8.1     Plaintiffs demand a jury trial.

## CONCLUSION AND PRAYER

WHEREFORE, premises considered, Plaintiffs request a jury trial and judgment pursuant to 28 U.S.C., Sections 1331 in order to secure relief authorized by 42 U.S.C., §§ 1983 and 1988 for violations of their rights to free speech and association under the First Amendment and due process and equal protection under the Fourteenth Amendment. Plaintiffs request

1)      awarding preliminary and permanent injunction mandating Defendants to restore the status quo ante before they locked Charlie, Laura and Brittany out of the automotive repair shop, constructively evicted them from their home, separated them from each other and enjoined them from living and

working together and publicly advocating for Charlie's federally protected rights;

2)     enjoining Defendants from violating Charlie, Laura and Brittany's federally protected rights, privileges and immunity in the future.

3)     awarding prejudgment and post judgment interest according to law;

4)     awarding Plaintiffs costs of Court including reasonable and necessary attorney's fees pursuant to 42 U.S.C., Section 1988, to be paid jointly and severally by Tonya and Mary, individually and as guardians;

5)     ordering such other relief, to which Plaintiffs may be justly entitled.

Respectfully submitted,

Philip M. Ross
1006 Holbrook Road
San Antonio, TX 78218
Phone: 210/326-2100
Email: ross_law@hotmail.com

By:     /s/  Philip M. Ross
Philip M. Ross
State Bar No. 17304200
Attorney for Laura Martinez-Thrash
and Brittany Martinez-Thrash

## VERIFICATION

STATE OF TEXAS      §
                        §
COUNTY OF BEXAR     §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Laura A. Martinez-Thrash who being by me duly sworn on oath or affirmation deposed and said that she is a Plaintiff; that she has read the above verified Original Complaint; and that every statement of fact in the motion is within her personal knowledge and is true and correct.



Laura A. Martinez-Thrash

SUBSCRIBED AND SWORN TO BEFORE ME on May 3, 2019, to certify which witness my hand and official seal.

JO ANN RIVERA
My Commission Expires
September 1, 2019

Notary in and for the State of Texas

## VERIFICATION

STATE OF TEXAS     §
                         §
COUNTY OF BEXAR    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Brittany A. Martinez-Thrash who being by me duly sworn on oath or affirmation deposed and said that she is a Plaintiff; that she has read the above verified Original Complaint; and that every statement of fact in the motion is within her personal knowledge and is true and correct.



Brittany A. Martinez-Thrash

SUBSCRIBED AND SWORN TO BEFORE ME on May 3, 2019, to certify which witness my hand and official seal.

JO ANN RIVERA
My Commission Expires
September 1, 2019

Notary in and for the State of Texas